**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 412, Plaintiff,**

v.

**KANSAS CITY POWER & LIGHT COMPANY, Defendant.**

No. 81–0432–CV–W–1.

United States District Court,
W. D. Missouri, W. D.

Jan. 14, 1982.

John P. Hurley, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for plaintiff.

Stanley E. Craven, Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDERS

JOHN W. OLIVER, Senior District Judge.

In this action plaintiff union seeks enforcement of an arbitration award. Though initially requesting injunctive relief pending the litigation of this suit, the parties, following a conference with the Court on September 4, 1981, agreed that there were no disputed issues of fact and that all facts necessary for the Court to enter final judgment could be stipulated. The parties further entered into a stipulation to maintain the status quo to allow the parties time to brief and the Court to rule the issues presented.

### I.

The findings of fact made herein are based on the stipulations and admissions of the parties. The sole legal question presented is whether the employer's adoption of its March, 1981 Absentee Control Program constitutes a refusal to comply with the prior 1980 award of Arbitrator Roberts.

*Findings of Fact*

1. This is an action brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and 28 U.S.C. § 1337.

2. The plaintiff International Brotherhood of Electrical Workers, Local Union No. 412 (hereinafter referred to as "the Union") seeks to enforce an arbitration award against the defendant Kansas City Power and Light Company (hereinafter referred to as "the Company").

3. The Company is a Missouri corporation and is an employer engaged in the production and distribution of electricity to customers located in the States of Missouri and Kansas with its principal office located in Kansas City, Missouri.

4. The Union is an unincorporated labor organization with its principal office located at 1017 Washington Street, Kansas City, Missouri.

5. The Union is one of three I.B.E.W. Locals which represent employees of the Company in bargaining units for purposes of collective bargaining.

6. The Union is the sole and exclusive bargaining representative for the unit or group of the Company's employees generally characterized as the production employees working in and out of the Company's various power plants.

7. The other two sister locals are exclusive bargaining representatives in the following units of the Company's employees: I.B.E.W. Local 1464 represents the "outside" employees which include a variety of classifications in the Transmission and Distribution Departments; and I.B.E.W. Local 1613 represents employees in the office and technical classifications.

8. Collective bargaining negotiations, while at times coordinated between the three locals and the Company, have always produced separate labor agreements with some differences as to the terms of employment covering employees in each of the three units. Likewise, the labor agreements themselves have always been administered separately between each of the three locals and the Company.

9. At all times material herein, the Company and the Union have been signatories to a series of collective bargaining agreements, the most recent of which having a term effective April 1, 1980 to and including June 30, 1982, containing the hours, rates of pay and other terms and conditions of employment for those employees represented by the Union at the various facilities of the Company.

10. Articles XII and XIII of the current collective bargaining agreement, as well as the immediately preceding agreement in effect, provide for a grievance procedure culminating in final and binding arbitration.

11. On or about April 16, 1979 the Company unilaterally instituted an Absentee Control Program, the principal purpose of which was to control absenteeism of employees by imposing a disciplinary procedure upon the employees for what was defined in the program as "excessive" absenteeism.

12. By a letter dated August 14, 1979, the Union, along with the two sister I.B. E.W. locals representing the employees in the other two units, filed a grievance with a request to proceed to an expedited arbitration proceeding over the issue of whether the 1979 Absentee Control Program was fair and reasonable as it applied to all employees in each of the three bargaining units.

13. On December 6, 1979, at a hearing held before Arbitrator Raymond R. Roberts, both the Union and the Company appeared by and through their designated representatives and presented their respective positions and evidence on the grievance.

14. On February 12, 1980, Arbitrator Roberts issued his Decision and Award sustaining the grievance, specifically finding that "the new absentee control program is not fair and reasonable, or in compliance with the Collective Bargaining Agreement on its face, and in its application."

15. Arbitrator Roberts' decision was based upon his determination that the Absentee Control Program was "fatally inconsistent with the concepts of just cause" due to (1) the incorporation of "no fault" features which fail to distinguish between excusable absenteeism and unexcusable absenteeism, (2) the counting of "personal days" as occurrences of absenteeism, and (3) the counting of tardiness as an occurrence of absenteeism by allowing tardiness control to be combined in the same program with absentee control.

The arbitrator concluded in his opinion that:

When all of these factors are taken into consideration, the attendance control program, as written, is in such serious conflict with concepts of just cause that the grievance must be sustained. The arbitrator is cognizant of the need of the Company to implement as quickly as possible a valid absentee and attendance control program and of the duration it has been without one while it attempted to draw a new one and subsequently to implement the present one. For this reason, the arbitrator has endeavored to specify in some detail the perimeters of a valid absentee control program under concepts of just cause and the principles that govern. Within those perimeters, Management is afforded broad latitude to fashion an absentee and attendance control program tailored to its needs, as demonstrated by the variety of programs which are encountered and approved. Within those limitations, it is Management's prerogative, and not that of the arbitrator or union, to determine the form and direction of that program. Where there are only a few very minor discrepancies with concepts of just cause, the arbitrator has, on occasion, supplied an alternative method in the form of specific language to Management, and approved the program conditional upon those changes so that it is not subject to further challenge as to reasonableness, but pointing out that Management is not bound by the arbitrator's suggestions. The present program will require too large a fundamental modification for the arbitrator to do so in the present case.

16. The award section of the arbitrator's decision stated:

For the reasons stated, *and in the respects stated*, the Arbitrator finds that the new absentee control program is not fair and reasonable, or in compliance with the Collective Bargaining Agreement on its face, and in its application. The program is ordered removed, the same as if it were never implemented. The record of disciplinary action of all employees who were disciplined under the program,

other than for just cause, shall be purged. The record of disciplinary action against any employee which was taken consistent with concepts of just cause, as it would apply in the *ad hoc* treatment of absenteeism in the absence of formal attendance control program, shall stand in the discretion of the Company, subject to the right of the Union to test the same by the grievance procedure. (emphasis ours)

17. On or about February 19, 1980, based upon Arbitrator Roberts' directive in his Award, the Company removed the 1979 Absentee Control Program as well as all discipline imposed under it from the affected employees' files.

18. From approximately February 19, 1980 to March 30, 1981, the Company had no formal, written absentee control program covering the employees in any of the three bargaining units.

19. In early 1980, each of the three locals began separate negotiations with the Company, based upon the Company's request, with no coordinated bargaining as had occurred in past years, except for some joint negotiations on pension and health and welfare issues.

20. During their respective contract negotiations in 1980, Locals 1464 and 1613 agreed to accept an absentee control program which was virtually identical to the one just removed on February 19, 1980, and this program was incorporated into each of the two locals' labor agreement.

21. Unlike its two sister locals, the Union never agreed to any type of absentee control plan covering its unit employees.

22. It was not until after the Company had "removed" the 1979 Absentee Control Program that the Company reached final agreements with the three locals for their new contracts. The Union's contract took effect on April 1, 1980 while Local 1464's agreement took effect on July 1, 1980 and Local 1613' agreement took effect on September 7, 1980.

23. On March 30, 1981 the Company implemented the Absentee Control Program agreed to by the two sister locals to cover all three groups of employees, notwithstanding that the Union had never agreed to it being applied to its particular group or unit of employees.

24. The only difference between the 1981 program and the previously stricken 1979 program is what is characterized as the "80 per cent exemption" provision.

25. The 80 per cent exemption provision, which was an addition to the 1981 program, exempts from all discipline any employee who has retained 80 per cent or more of the maximum possible sick leave he or she could have earned.

26. A uniform method for computing sick leave was agreed upon by the Company and the three locals. Under all three labor agreements, an employee is credited with six (6) days of sick leave upon completion of his or her six month probationary period and, thereafter, is credited with additional sick leave at the rate of one working day per month, up to a maximum of one hundred and eighty (180) working days.

27. Under the Absentee Control Program imposed on March 30, 1981, an employee who has been employed by the Company for one year, for example, and who has used more than 20% (2.4 days) of his or her maximum possible sick leave, is subject to exactly the same disciplinary procedure which he or she would have been subject to under the 1979 program struck down by Arbitrator Roberts.

28. The features of the 1979 program which Arbitrator Roberts determined to be "fatally inconsistent with the concepts of just cause" are continued without change in the 1981 plan and in no way are altered or moderated by the added "80 per cent exemption."

29. Between the time it removed the 1979 Absentee Control Program and the time of the implementation of its latest absentee program on March 30, 1981, the Company disciplined employees in the Union's bargaining unit for attendance problems by giving them both verbal and written warnings.

30. At the time of implementing its 1981 program, the Company placed some of the employees who had been disciplined during the period when no formal, written program was in effect, at Step 1 of the program's progressive disciplinary procedure, meaning that the next step for them would be Step 2.

## II.

■ The *Steelworkers* trilogy and its progeny make clear that the role of the federal judiciary in arbitration disputes, though limited, is twofold. One, the courts may require reluctant parties to arbitrate disputes made subject to mandatory arbitration under operative collective bargaining agreements. Two, the courts may enforce prior awards rendered by arbitrators who acted within their jurisdiction. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

The plaintiff Union contends that the 1981 plan is virtually identical to the 1979 plan which the arbitrator ordered removed and that it is entitled to enforcement of that award. The employer contends that it complied with the arbitrator's award by removing the 1979 plan; that the 1981 plan is materially different; that in any event the arbitration award had no prospective effect; and that the union's only recourse is to file a new grievance and submit to arbitration the question of whether the 1981 plan violates either the collective bargaining agreement between the parties or the prior arbitration award.

We do not agree with the employer's view of the issue raised by plaintiff union's complaint. Though we agree that if the new plan imposed was essentially different from the plan found defective by the arbitrator, the union would be required to follow the mandatory arbitration procedures it has agreed to by collective bargaining, we are not presented with that situation in this case. It is obvious that the company could not force a second arbitration proceeding if it did no more than withdraw the plan held to be invalid by the 1980 award and then *reimplement* a virtually *identical* plan the following year.

■ The Union has already submitted its dispute with the Company's 1979 absentee control program to arbitration. The arbitrator sustained the Union's position. The Company's *ex parte* 1981 plan is neither "materially" different nor even "arguably" different. Because we find the disputed plan virtually identical on its face to that found to be defective and ordered removed by Arbitrator Roberts, the Union is entitled to enforcement of the prior award. To force the Union to again arbitrate what is essentially the same dispute would be to place them in the "heads I win, tails you lose" situation envisioned by Justice Douglas in *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).

In accordance with our view of the issue raised which we have expressed above and our findings of fact, we make the following conclusions of law:

### Conclusions of Law

1. This action arises under and the Court has jurisdiction over the subject matter of this action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and 28 U.S.C. § 1337.

2. The Union is a labor organization and representative within the meaning of, and subject to, 29 U.S.C. § 185(a).

3. The Company is an employer within the meaning of, and subject to, 29 U.S.C. § 185(a).

■ 4. Arbitrator Roberts' Decision and Award which issued on February 12, 1980 striking down the 1979 Absentee Control Program is valid and proper in all respects, drawing its essence from the terms of the parties' contract, and by virtue of the con-

tract is final and binding upon the parties thereto. As such, pursuant to 29 U.S.C. § 185, the award can be enforced in federal court by requiring a recalcitrant party to abide by the award. See generally, *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); and *General Drivers & Helpers Union, Local 554 v. Young & Hay Transportation Co.*, 522 F.2d 562 (8th Cir. 1975).

5. The award of the arbitrator need not be read in isolation from his opinion. This Circuit clearly relies on the opinion section of the arbitrator's decision as well as on the award section in determining the meaning of the award. See *Ford Parcel Service, Inc. v. Misc. Drivers and Helpers Union No. 610*, 656 F.2d 387 (8th Cir. 1981) and *Rainbow Glass v. Local Union No. 610*, 663 F.2d 814 (8th Cir. 1981). See also *United Steelworkers v. Enterprise Corp., supra*, 363 U.S. at 598, 80 S.Ct. at 1361.

The reasoning of the arbitrator may not be required to support an award, but certainly it is untenable to argue it may not be utilized to construe the award when it does so clearly and free of ambiguity. At least this is true when, as in the pending case, the arbitrator specifically states in his award that the program violates the collective bargaining agreement in the particular respects set forth more fully in his opinion.

6. The Company's institution of the 1981 Absentee Control Program with respect to its application to the unit of employees represented by the Union constitutes a refusal to comply with the aforesaid arbitration award, notwithstanding the addition to it of the 80 per cent exemption provision and the fact that it has been contractually accepted by the other two sister locals of the Union.

7. The 80 per cent exemption does not materially affect or attempt to correct in any way the features of the 1979 program which were characterized by the Arbitrator as "fatally inconsistent with the concepts of just cause."

8. The fact that the other two locals contractually accepted the 1981 program in no way affects or lessens the Union's right to insist upon strict compliance with the arbitration award by the Company pursuant to *its* collective bargaining agreement covering *its* bargaining unit employees.

9. The Union is entitled, under the foregoing facts and principles of law, to a judgment enforcing the arbitration award and ordering the Company to immediately comply with the award by ceasing to apply the 1981 program to the employees represented by the Union, to revoke all prior disciplinary action taken thereunder against such employees, and to remove all references of such prior discipline from these employees' files.

10. We have considered all the cases relied upon by plaintiff to support its request for an award of attorney's fees and have concluded that they do not justify an attorney fee award in this case. We do not perceive bad faith by the employer. In the absence of a situation in which the company could be said to be litigating simply for the sake of litigation, without any real hope of prevailing on the merits, we believe a fee award in this case would be improper. *Cf. Local Union No. 4 International Brotherhood of Electrical Workers v. Radio Thirteen-Eighty, Inc.*, 469 F.2d 610, 615 (8th Cir. 1972).

For the reasons stated above, it is

ORDERED (1) that final judgment shall be entered for plaintiff. Plaintiff shall prepare a proposed form of final judgment in accordance with the Court's findings and conclusions as stated above, submit it to defendant for approval as to form, and then submit it to the Court for its approval. It is further

ORDERED (2) that plaintiff's request for attorney's fees should be and hereby is denied.